[No. 1929.]

## J. H. HARRISON *v.* THE STATE.

1. MURDER — EVIDENCE — CONFESSIONS — CASE STATED.— The State, in a trial for murder, proved by one J. W. Levy that the defendant, a few minutes after the homicide, said that he killed the deceased to save his own life. E. Levy testified that he heard the defendant's statement to J. W. L. and that the statement was that he killed the deceased to "save himself" or "protect himself." The defense proposed to prove by one W. that three or

four minutes after the homicide, the defendant, in reply to witness's question, said that he killed the deceased to " protect his wife and child." The trial court rejected the evidence because, 1, " the defendant was under arrest and in custody for the same offense of which he stands indicted at the time the statement was made." 2. " Because the proposed statement was different from, and inconsistent with, the statements previously made to the Levys." 3. " Because the same was not spontaneous, but appeared to have been made after the defendant must have considered of his defense." *Held,* that the ruling of the trial court was error. In the first place, article 750 of the Code of Criminal Procedure is not intended to operate against a defendant, and cannot be invoked by the State to exclude the declarations of the defendant made when in custody, if the same be otherwise admissible. In the second place, the rule is that, if such declarations were so nearly connected with the main transaction as to be a part thereof, the fact that they were conflicting or inconsistent cannot be made the test of their admissibility. In the third place the purport of the testimony of the Levys is not of a character to render the rejected declaration so far inconsistent as to destroy its spontaneity. See the opinion *in extenso* on the question.

2. Same — Case Approved. — The rejected statement was admissible, in view of the testimony of the State's witnesses Levy, under the additional rule that, when a confession or admission is introduced in evidence against a party, such party is entitled to prove the whole of what he said upon the subject, in explanation of the statements proved against him, whether made at or subsequent to the time he made the confession or admission. For the rule *in extenso* see *Greene* v. *The State,* 17 Texas Ct. App., 395; and note the opinion for approval of the same.

Appeal from the District Court of Grayson. Tried below before the Hon. R. Maltbie.

The indictment charged the appellant with the murder of Jack Goodwin in Grayson county, Texas, on the 27th day of August, 1885. His trial resulted in his conviction of murder in the first degree, and his punishment was assessed at a life term in the penitentiary.

Albert Bywaters was the first witness for the State. He testified that, at the time of the homicide, he was in the employ of W. E. Harrington, the proprietor of the Bank Saloon in Sherman, Texas, as porter about the saloon. He saw the shooting. The deceased was then, and had been for about four months, bar-tender at the Bank Saloon. When shot, the deceased was standing behind the bar mixing drinks, having a whisky and a water glass in his hand. Witness was standing by his side with a waiter in his hand. Defendant walked into the saloon at the back door, pulled two pistols and fired on deceased, without a word. He fired once across the counter, when deceased fell. He then changed pistols, passed to the end of the counter, and from that position continued to fire upon the deceased, who was then lying on the floor behind the

counter. Witness could not then see the deceased, but could hear him hallooing, though not well enough to distinguish what his words were. Witness had often seen the deceased refuse to serve the defendant with drinks without the money. Billy Harrington, defendant's brother-in-law, instructed the deceased not to sell defendant whisky on credit. The witness last heard deceased refuse defendant whisky on credit, a few days before the homicide.

Cross-examined, the witness testified that no one was in the saloon at the time of the shooting save witness, defendant and deceased. Lee Frost was not in the saloon at that time, or witness would have seen him. No one was then engaged in a game of billiards. When the defendant fired the first shot the deceased was in the act of placing a milk-punch on a waiter, which the witness held balanced on the counter to the right of the deceased. Deceased used his right hand in placing the milk-punch on the waiter, and at the time had his left hand under the counter. Defendant certainly saw the deceased's right, but could not have seen his left hand. Witness had never before testified about deceased's left hand being behind the counter, because he had never been questioned as to the position of the deceased's left hand. No one had talked with witness about his testimony in this case. Jack Goodwin died a few minutes after he was shot.

Doctor Steever testified, for the State, that he saw the body of the deceased shortly after he was killed. He was then lying behind the bar in the Bank Saloon, in Sherman, Texas. The last of three wounds broke the neck of the deceased, and caused death in a very short time.

R. E. Kelly testified, for the State, that, about ten days before the killing, the defendant applied to him for the loan of a pistol. Witness told defendant that he did not own a pistol. About three weeks before the killing, George Leonard, deceased's associate bartender at the Bank Saloon, got on a protracted drunk. While Leonard was drunk, the defendant said to witness that George Leonard was on a big drunk, and that, if witness and some others would speak a good word for him, defendant, he thought he could get a job. Deceased was then on watch at the Bank Saloon. Witness had loaned defendant a pistol a half dozen times at least.

Joe Melton was the next witness for the State. He testified that, at midnight on the Tuesday night before the Thursday of the killing, defendant, in a bad humor, complained to witness that some one had poured water over the bed occupied by himself and wife. Witness went with him to his room and found water over his bed. The

ceiling overhead was tongued and grooved, but the planks had parted slightly. Witness saw no evidence of water overhead. Witness was informed that the room overhead was occupied by the deceased and his wife.

J. C. Burns testified, for the State, that about midnight of the Monday or Tuesday night before the killing, defendant told him that some one had saturated his bed with chamber-lye or urine, and that he could not go home to sleep, as his wife was afraid to occupy the bed. This conversation occurred while witness and defendant were walking from the Schneider corner to a point opposite the Bank Saloon. When that point was reached defendant remarked that he was much inclined to go over to the Bank Saloon and make that d—d son-of-a-b—h (referring to deceased) shut up the house and go and clean the water from the bed. Witness advised him not to take such a step, but to wait and see the deceased after daylight, as possibly the deceased knew nothing about it. Defendant replied that he had the tools to do it with, and showed the witness two pistols which he drew from under his clothes. Defendant said that the deceased and his wife occupied the room above his, and that the deceased's wife poured the urine over his bed. Witness then advised defendant to take his wife to his father-in-law's house, a few doors distant from his room, to stay over night, and to say nothing to deceased until next morning. Defendant finally said that he would act upon witness's advice, and left witness, and witness watched him as far as the Crockford Saloon, about half way to his room. If the defendant was then an officer of any kind, and, as such, authorized to carry weapons, the witness did not know it.

Frank Connelly testified, for the State, that he was standing in the street in front of the Anchor corner when the first shot was fired, at the time of the homicide. He immediately ran to the Bank Saloon, and *en route* observed Lee Walker and W. E. Harrington then standing in the back door of the Bank Saloon. No one passed out of the saloon that the witness saw, after the first shot, and before witness reached the saloon. When he reached the blind door of the saloon, witness pushed it open and looked in. The negro porter, Albert Bywaters, was standing in the middle of the floor, and defendant was standing at the west end of the counter, firing his pistol. Witness could see his pistol each time it was thrown down to shoot, but did not see it at either explosion. Defendant fired several shots, downward, towards the floor, while the witness stood at the door, but witness could not see at whom or at what he was shooting. He could hear some one shuffling about, and begging not to be killed. After

the shooting defendant stepped out at the front door with a pistol in each hand, and told the people who had congregated to step aside and let him pass. They did so, and defendant walked off down the sidewalk towards the hardware store. Witness saw Al. Rouse pass into the Bank Saloon after the shooting. He did not see Lee Frost at all.

Cross-examined, the witness testified that the shooting occurred in broad daylight, about noon, in the Bank Saloon, on the northeast corner of the public square in the city of Sherman, Texas. The streets at the time were full of people. When witness got to the door, there was no person other than Bywaters, defendant and deceased in the saloon. He met no one coming out of the saloon.

Joseph L. Cobb, testifying for the State, identified a pistol exhibited as the pistol which he loaned the defendant a week or ten days before the killing. He had loaned that pistol to the defendant on at least two previous occasions.

P. P. Houck testified, for the State, that, when the shooting commenced, he was in Levy's store, which stood in the rear of the Bank Saloon. Witness ran out into Houston street and went into the saloon through the Houston street entrance. When he got into the saloon, he saw a man step to the open end of the bar counter and fire five times. He then heard some one say, "O! don't!" Witness did not recognize the party who did the shooting.

Lee Frost was the next witness for the State. He testified that he left the "S. E." Saloon, south of the public square in Sherman, at precisely 12 o'clock, M., to go to his dinner. The "S. E." and the Bank saloons were about one and a half blocks apart. Witness stepped into the Bank Saloon and engaged Jack Goodwin in conversation across the counter. Goodwin was near the east end of the counter, mixing some drinks. Bywaters stood east and to the right of deceased, behind the counter. He held one end of a waiter, the other end resting on the counter. Defendant came into the saloon through the side or Houston street door. He walked up to the bar, drew his pistol, and, without a word, commenced shooting. Deceased fell at the first shot, and witness ran out at the front door. He heard other shots fired after he got out of the saloon.

Al. Rouse testified, for the State, that he was in the "Q. T." Saloon, a short distance from the Bank Saloon, when the first shot was fired. He started immediately to the place of the shooting. He met Lee Frost on Houston street, between Schneider's store and the Bank Saloon. Lee remarked, as he passed: "John Harrison is killing Jack." When the witness got near the door, defendant

came out of the saloon with his pistols in his hands. He said nothing. Witness stepped into the saloon and heard groaning. He then passed behind the counter and found the deceased lying on the floor, his feet pointing east, his head under the counter, and his body bent. One hand clasped a spoon. Witness turned him over, but he was too far gone to speak. A waiter containing some glasses, one filled with a milk punch, was resting on the east end of the counter. The witness found a glass on the floor, and near the body, which still contained a little of a rum punch.

Ed. Steedman testified, for the State, that he was standing at the Anchor corner when the deceased was killed. He understood some one to say that "the judge is shot." He then ran to the Bank Saloon, opened the lattice door and passed in and saw the defendant shooting. He then saw the defendant pass out of the saloon with his pistols in his hands, and walk off in a southerly direction, towards the jail.

Lee Walker testified, for the State, that, at the time of the homicide, he was standing at the side or Houston street door of the Bank Saloon, talking to W. E. Harrington. At about 12, M., defendant passed through the Houston street entrance into the saloon, and went through it towards the bar. Witness then heard the shooting and remarked to Harrington that defendant was killing his bartender.

Constable S. E. Wright testified, for the State, that he was engaged in the court-house at the time of the killing. When he heard the first shot he ran immediately towards the Bank Saloon, and met the defendant, with a pistol in each hand, going towards the jail. He surrendered to witness, but made no statement about the killing. About one minute had elapsed since the last shot was fired.

Cross-examined, the witness stated that upon the surrender of defendant witness took his pistols, and walked him across the street into the court-house, and shortly afterwards delivered him to Jailer O'Callahan. Defendant had no conference with his wife while in the custody of the witness.

J. W. Levy testified, for the State, that he was the proprietor of a store situated two doors south of the Bank Saloon in Sherman, Texas. Witness started to his dinner about noon on the day of the homicide. When he reached the hardware store, two doors south of his store, witness heard a shot fired in the Bank Saloon. He turned back, and when he reached the front of his own store, he saw the defendant, with a pistol in each hand, step out of the saloon and start off south. As he passed, the witness asked him: "What

are you doing with those pistols?" The defendant replied: "I did it to save my own life."

Ed. Levy testified, for the State, that he was standing near, and heard J. W. Levy, just after the shooting, ask defendant: "What is the matter?" Defendant replied that he had to do it to save himself or protect himself. Witness could not say that the word the defendant used was "save" or "protect."

Ben. Mathews testified, for the State, that he was the proprietor of the new Southern Hotel in Sherman, Texas. The defendant, deceased and their wives boarded with the witness until a very few days before the homicide. They occupied rooms across the street in the old Byrd Anderson house, the defendant and his wife occupying a room on the ground floor, and the deceased and his wife the room directly overhead. The witness heard of the water being poured over the defendant's bed, on the morning after it was said to have occurred. He went to the room and examined it, but could find no indications that water had been poured into that room or from the room above. The floor of the deceased's room was closely tongued and grooved, and was heavily carpeted. The ceiling of the defendant's room was closely tongued and grooved. The overhead room was scoured and washed a few days afterwards, and the floor was not penetrated by the water. Though water was poured plentifully over the floor it did not leak a drop.

Julius Zimmerman testified, for the State, that he knew both the defendant and deceased. Those two gentlemen were not on very good terms at the time of, and for some time before, the killing. The deceased had often refused to sell drinks to the defendant on credit. Witness had refused to credit the defendant for drinks. For a year prior to the killing the defendant had been drinking very hard, but witness could not say that he was drinking at the time of the killing. Defendant harbored hard feelings towards the deceased because, as he said, the deceased kept him from securing employment with his, defendant's, brother-in-law, Harrington, the proprietor of the Bank Saloon. The State closed.

· Charles Whitehurst was the first witness for the defense. He testified that he was at the livery-stable of Gunter & Kelly on the morning of the killing. At about half-past 11 o'clock on that day the defendant passed the livery-stable, *en route* to old man Harrington's house, where he was then staying. He stopped at the stable about five minutes, and walked on towards Harrington's house. Witness had no recollection of seeing defendant going back.

J. B. Cartwright testified, for the defense, that he was employed

at the Harrington House, just north of old man Harrington's private residence. About five minutes before the killing, defendant passed to the street through the alley leading from the room he then occupied in old man's Harrington's house. Witness, who was then ringing the dinner bell, advised defendant to wait for dinner before going to town, dinner being then ready. Defendant made some unintelligible reply, and went on towards Gunter & Kelly's stable.

John Young testified, for the defense, that he left his store at exactly 12 o'clock to go to dinner. He stopped at Schneider's corner, just opposite the Bank Saloon, to talk to Dave Bryant. He and Bryant had been in conversation not exceeding two minutes when defendant passed them, crossed Houston street, and entered the Bank Saloon at the Houston street door. Within another minute witness heard the shooting. Witness's store was not exceeding one hundred and fifty yards from Schneider's corner.

W. E. Harrington testified, for the defense, that he was the proprietor of the Bank Saloon at the time of the killing. At about 12 o'clock on the day of the homicide, he and Lee Walker were standing at the Houston street door of the saloon. Defendant came down Houston street, passed into the saloon at the Houston street door, remarking, as he went in: "Howdy, Bill." The shooting commenced shortly afterwards.

C. B. Wandelohr testified, for the defense, that about the time the shooting ceased, he started across the square to the court-house from his office. He met the defendant and Officer Wright at the intersection of the halls which crossed the ground floor of the court-house, and went with them into the justice's office. As soon as the crowd was locked out, witness asked defendant: "How did you come to do this?" The State objected, and the witness was not permitted to repeat the defendant's reply, but it is stated in substance in the opinion of this court.

Mrs. J. H. Harrison, the wife of the defendant, was his next witness. The opinion of the court sets out, in full, her testimony in chief. On her cross-examination the witness said that she had never before testified in relation to this homicide. She had never denied that the killing was done on her account, nor had she ever stated that she was ignorant of the cause which led to the killing. Witness had a conversation with Mrs. Mathews, a few days before this trial, in which Mrs. Mathews asked if witness did not remember that she, witness, on the day of, and just after the killing, said to her, Mrs. Mathews: "God knows I don't know why he killed him. I would rather he had killed me." Witness replied then, and

reiterates, that she had no recollection of saying any such thing. Witness did not recollect, nor did she believe, that at her father's house or any where else, in the presence of Mrs. Mathews, Mrs. Hartsfield, Mrs. Rouse or any body else, she had ever made the remark imputed to her, or a remark in any degree similar to it. About ten minutes after the shooting, the witness was advised by Mr. Nat Gunter, one of the defendant's counsel, not to talk about the killing.

M. O'Callahan, jailer, testified that he received the defendant from Officer Wright about 2 o'clock on the evening of the killing, and had had him in charge ever since. During that time the defendant and his wife have never had an interview out of witness's sight and hearing.

C. A. Buckler testified that he had been of counsel for the defense ever since the homicide. It was upon his advice and that of his associate counsel, Judge Hare, that the defendant waived examination, and introduced no evidence upon the coroner's inquest. Defendant's examining trial was postponed a few days to accommodate Judge Hare, who was engaged in the United States commissioner's court. The defense closed.

Mrs. Hartsfield was the State's first witness in rebuttal. She testified that she heard Mrs. Harrison, the wife of the defendant, at her father's house, at about 3 o'clock on the evening of the killing, and in the presence of Mrs. Mathews and another lady, say, with reference to the killing: "I don't know, God knows, what he did it for." She was then weeping bitterly, and was evidently in great distress.

Mrs. Mathews testified, for the State, in rebuttal, that about 2 o'clock, and shortly after the killing, she asked Mrs. Harrison why her husband killed the deceased. Mrs. Harrison replied: "In God's name, I don't know. I would rather he had killed me." This occurred at the house of Mrs. Harrison's father and in the presence of Mrs. Hartsfield and Mrs. Rouse. Mrs. Harrison was then in great distress.

Mrs. John Boland, Mrs. Harrison's sister, testified, for the State, that a few minutes after the shooting, Mrs. Harrison reproached her as helping to aggravate defendant, and said to witness: "You are the cause of this."

The State recalled Mrs. Harrison, who testified that she had no recollection of making the statements imputed to her by her sister, Mrs. Boland.

The motion for new trial raised the questions discussed in the opinion.

*Hare, Head & Hare, Buckler & McLean,* and *Brown & Gunter,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

Hurt, Judge. On the 31st day of August, 1885, in the city of Sherman, and in the Bank Saloon, Harrison shot and killed Jack Goodwin. For this homicide he was indicted and convicted of murder of the first degree, his punishment being assessed at confinement in the penitentiary for life.

Mrs. Harrison, the wife of defendant, testified as follows:

"I remember the occurrence of the killing of Goodwin. I was at that time at my father's house (locating it). On the day of the killing my husband, the defendant, came home between half-past 11 and a quarter to 12 o'clock. When he came I was in the back room of my father's house, down stairs. I told him how the deceased, Jack Goodwin, had treated me. I told him what the deceased had said and done to me on the last day of the old settlers' picnic, which was Friday, I think, on the 21st day of August, 1885. Deceased came down between 6 and 7 o'clock in the evening. I was standing in the passage between the two houses. Goodwin then said to me: 'Johnnie is riding to-day.' I said 'yes.' He then asked me where Nettie was. Nettie is his wife. I told him she was gone to supper. He stepped up to me and took me by the hand and said: 'Come in here and let's have some fun,' and started towards the door of a little room on the south side of the passage, the door of which opens into the passage. I broke away from him and ran to the gate. I told him never to speak or look at me again, and that if he ever spoke to me that way again I would tell my husband. At the time this occurred I did not tell my husband of it. On the Tuesday before the killing Jack Goodwin came home about dusk in the evening, and met me again in the passage way while I was going to my room. I leaned back against the wall to give him room to pass, and he came up to me with both hands and lifted me through the door into the little room and pulled the door to, I think with his foot. I then pushed the door open with my foot, and he let loose of me with one hand to shut the door again, when I broke loose from him and ran out through the back door. When he had hold of me and had lifted me into the little room, he said something that sounded like 'I have got you now.' When my husband came home on the day of the killing, about a quarter to 12 o'clock, I told him this. He had our child on his lap when I was telling it to him. He put the child down on the floor, and got up and stood by the

door, and turned pale like he was going to have a chill, and placed his hand on his head and said, 'Oh, my God!' I said, 'Don't go up town,' and he said, 'I will go up stairs.' He went up stairs. I was about to tell this to my husband once, I think, the evening before the killing, but some one, think my sister, came in and I did not tell him. The first I knew of the killing was hearing some negroes in the kitchen of the Harrington House talking about some shooting up town. I said to whoever it was in the room, I think my mother, 'I will go up stairs and ask Mr. Harrison what the shooting was about,' thinking that it was some shooting which had occurred before he came home. I did not know that he had gone out until my sister told me he was not up stairs, and that he had gone."

The homicide was upon the first meeting of defendant and deceased after this conversation is said to have occurred. A few minutes after the shooting, the defendant told J. W. Levy that he had done it (the shooting) to save his own life. Ed. Levy states that he heard J. W. Levy's question to defendant, and that defendant answered: "I had to do it to save myself, or to protect myself."

Defendant offered to prove by C. K. Wandelohr that, within from three to four minutes after the shooting, the time it would take witness to walk one hundred yards at an ordinary gait, he asked defendant what made him do it, and he replied: "I done it to protect my wife and child." That the defendant did not seem excited at first, but, when he made the answer "that it was to protect his wife and child, his, the defendant's, eyes filled with tears," etc. To this proposed evidence the county attorney objected, upon the ground that the proposed evidence was the declarations of defendant, hearsay, not *res gestæ*, and hence not admissible. The court sustained the objection and defendant excepted and saved his bill.

The learned judge appends the following reasons for sustaining the objections of the State and rejecting the evidence: "1st. The defendant was under arrest and in custody for the same offense of which he stands indicted, at the time the statement was made.

"2d. Because the proposed statement was different from and inconsistent with the statement previously made to the Levys.

"3d. Because the same was not spontaneous, but appeared to have been made after the defendant must have considered of his defense." We will notice these reasons of the learned judge in the order stated.

1. That defendant was under arrest for the same offense. Let this be conceded, certainly it does not follow that if the facts pro-

posed are relevant and otherwise competent, they are not incompetent for defendant because he may be in custody or arrest for the same offense. Article 750, Code Criminal Procedure, can never be used against a defendant so as to deprive him of legitimate evidence. This article is a shield, but never a weapon to be applied to a defendant.

2d. "Because the proposed statement was different from and inconsistent with the statement previously made to the Levys." If so nearly connected with the main transaction as to be a part thereof, the fact that the declarations were the same, conflicting or inconsistent, has never been made a test of admissibility. The Levys may have mistaken or misapprehended defendant, or defendant may have misused words, or have failed to express his own meaning. (1 Greenlf. Ev., 214.) That a witness may misapprehend what is said by a party is demonstrated in the testimony of the Levys. J. W. Levy says that defendant stated "that he had done it to *save his own life.*" Ed. Levy, who heard J. W. Levy's question and defendant's answer thereto, says that defendant said, "I had to do it to *save myself* or to *protect myself.*" Now in this the word "life" is not mentioned. Again, J. W. Levy makes him say "he *had done* it to save his own life;" Ed., that he "*had to do it* to save myself or protect myself." It will be seen that while these different statements are in substance the same, yet the words used by defendant are not the same; and hence we must infer that these witnesses, the Levys, reproduced in their testimony not the language actually used by defendant, but the ideas which each believed he conveyed. If they intended to reproduce the exact language they certainly did not understand him alike, and one of the two most evidently misapprehended defendant; and if one made a mistake as to what words defendant said, may not both have been mistaken? Can we, as a postulate, assume the infallibility of a witness, and preclude the testimony of other witnesses which is relevant and competent but for the assumed infallibility of the first? We think not.

3d. "Because the same was not spontaneous, but appears to have been made after the defendant must have considered of his defense."

We suppose the learned judge reached the conclusion that the statement made was not "spontaneous," because inconsistent with the statement previously made to the Levys. Let us examine this matter. The rule is that the confessions of the accused are to be received with caution. Why? Because, among other reasons, "the party may fail to express his own meaning." Ed. Levy understood

him to say, "I had to do it to save myself, or to protect myself." Ed. may have understood him correctly. To Wandelohr he stated: "I done it to protect my wife and child." How are these statements inconsistent? Let us concede that he had stated to Ed. Levy that he had to do it to save or protect himself. Would this not be true, and yet consistent with the statement that he did it to protect his wife and child?

For the purpose of this discussion, he, a short time before the killing, was informed by his wife that deceased had made an attempt upon the virtue of his wife,— to defile his bed and make of defendant a miserable cuckold. If true, were the wife and child alone affected? To an honorable man was not this "the most unkindest cut of all,"— the most deadly stab, attempted upon defendant? Now, then, when he stated that "he had to do it to save or protect himself," may he not have been referring to this very matter,— the advances of deceased towards his wife? If so, there is no conflict in the statements, and hence no grounds to support the conclusion of the trial judge that the statement was not spontaneous.

Upon another ground we think this statement admissible. The State introduced in evidence the statements made to the Levys by defendant. Now, as they disagreed as to what defendant actually stated, and as the version of Ed. Levy is susceptible of explanation, to fully explain this statement the defendant had the right to give in evidence his statement to Wandelohr. (See this subject most fully and clearly discussed in *Greene* v. *The State*, 17 Texas Ct. App., 395.)

We are of opinion that the court erred in rejecting the proposed evidence; for which the judgment is reversed and the case remanded for another trial.

*Reversed and remanded.*